STATE OF LOUISIANA

VERSUS

DENIS Y. AMAYA-RODRIGUEZ

NO. 19-KA-91

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 16,369, DIVISION "C"
HONORABLE J. STERLING SNOWDY, JUDGE PRESIDING


November 13, 2019


**HANS J. LILJEBERG**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and Hans J. Liljeberg


**<u>AFFIRMED</u>**
    **HJL**
    **JGG**
    **MEJ**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Bridget A. Dinvaut
    Henri P. Dufresne

COUNSEL FOR DEFENDANT/APPELLANT,
DENIS Y. AMAYA-RODRIGUEZ
    Lieu T. Vo Clark

**LILJEBERG, J.**

Defendant, Denis Y. Amaya-Rodriguez, appeals the consecutive nature of the sentences imposed by the trial court following his convictions for three counts of negligent homicide. For the reasons stated more fully below, we affirm defendant's convictions and sentences.

## PROCEDURAL BACKGROUND

On October 10, 2016, a St. John the Baptist Parish grand jury indicted defendant with three counts of negligent homicide in violation of La. R.S. 14:32. On January 9-11, 2018, the case was tried before a six-person jury that found defendant guilty as charged on all three counts. Following a sentencing hearing on April 9, 2018, the trial court sentenced defendant to imprisonment at hard labor for five years on each count to run consecutively for a total of fifteen years. The trial court also imposed a fine of $5,000.

On April 23, 2018, defendant filed a timely Motion to Reconsider Sentence Relative to Consecutive Sentencing of the Defendant that was denied on April 26, 2018. On May 29, 2018, defendant filed a Notice of Intent to Appeal Conviction and Motion to Reconsider Sentence. On that same date, the trial court granted defendant's motion for appeal.

## STATEMENT OF FACTS

Early Sunday morning on August 28, 2016, defendant was driving a 2003 black El Dorado party bus filled with approximately 40 passengers. The bus was on the I-10 bridge just west of Laplace headed towards Baton Rouge. While on the bridge, defendant encountered slow-moving traffic in the left lane passing the scene of a prior single-vehicle accident located in the right lane of the bridge. Defendant continued to drive the bus at a high rate of speed in the right lane, and when he encountered the prior accident scene, he cut over into the slow moving traffic in the left lane. Defendant failed to slow the bus down and crashed it into

the back of a red Toyota Camry.  The impact pushed the Toyota Camry into the back of a trailer being pulled by a Chevrolet Silverado.  The bus then clipped the left front of a fire truck that was blocking the right lane where the prior accident occurred.  After crashing into these vehicles, the bus then knocked three firemen who were standing next to the guardrail on the side of the bridge into the water below.  The Toyota Camry and Silverado crashed into the vehicle involved in the initial accident.

A total of 39 individuals were injured due to the accident.  Three individuals died - a fireman, Spencer Chauvin, and two passengers in the Toyota Camry, Jermaine Starr and Vontarous Kelly.  The entire back of the Toyota Camry was destroyed due to the force of the impact with the bus.  Defendant was subsequently charged with the negligent homicide of these three individuals.

At the time of the accident, William Beal was employed by the St. John Parish Fire Department as a firefighter operator.  He testified at trial that on August 28, 2016, the fire department received a call regarding a single-vehicle accident on the bridge.  Mr. Beal and his partner, Nick Saale, responded to the call in a fire truck.  Their district chief, Spencer Chauvin, arrived in his unit vehicle.  Mr. Beale explained that when they arrived at the accident scene, they parked the fire truck behind the accident scene and angled the truck outward from the right shoulder into the right lane to protect the scene from oncoming traffic.  Mr. Beale further testified that they activated all of the lights on the fire truck, as well as a "directional" yellow strobe light to divert traffic to the left lane.

While waiting for a tow truck to arrive, Mr. Beal and Mr. Saale were leaning against the guardrail, and Mr. Chauvin had his back to the interstate.  Mr. Beal then saw a pile of debris fly up into the air and a bus coming toward them.  He pushed Mr. Saale and tried to grab Mr. Chauvin because they did not see the bus.  Mr. Beal testified that he got hit and recalled waking up in the water below the

interstate. Mr. Chauvin told him he thought his leg was broken and Mr. Beal helped him stay above the water. Mr. Beal yelled to Louisiana State Police Trooper David Easley, who had also responded to the scene of the prior accident, to grab a ladder and get on the radio to call for help.

Mr. Beal testified that a person on the bridge pointed out an object in the water. Mr. Beal then reached under the water and located Mr. Saale, who was unresponsive and not breathing. Mr. Beal started mouth-to-mouth resuscitation and chest compressions, and eventually, Mr. Saale started breathing again. Mr. Beal personally sustained several injuries, including a torn meniscus in his right knee, a thumb injury, a right shoulder injury, and a head injury. Mr. Beal testified that the accident changed his life and he has constant nightmares and relives the accident every day.

Louisiana State Trooper Easley testified that on the morning of August 28, 2016, he received a call to respond to a single-vehicle accident on westbound I-10. He pulled his vehicle into the right lane of the bridge between the fire truck and the vehicle in the accident. After conducting his investigation, Trooper Easley returned to his vehicle to input information into his computer. Three firemen, Mr. Chauvin, Mr. Beal, and Mr. Saale, were standing approximately 100 feet in front of his vehicle against the bridge guardrail.

Trooper Easley testified that he was sitting in his car with his window down, when he heard a crash next to him. He stated that a red vehicle was struck and that glass and debris came into his vehicle. A bus then passed across the front of his vehicle and struck the bridge guardrail a few feet in front of where the three firemen were standing. Trooper Easley next saw that the firemen were missing. He called for help and observed bus passengers breaking windows and trying to get out of the bus. He then saw Mr. Chauvin and Mr. Beal in the water, but he could not find Mr. Saale. Trooper Easley asked other individuals on the scene to help

him retrieve a ladder and put it in the water. Trooper Easley went down the ladder and a man standing on top of the bridge told him he saw Mr. Saale. He testified that Mr. Beal pulled Mr. Saale up out of the water and tried to clear his airway.

Trooper Easley recalled that Mr. Chauvin told him his leg was broken and he and others helped Mr. Chauvin stay above the water until they were able to place him in a basket and bring him up onto the bridge. Mr. Chauvin appeared to be in a great deal of pain and lost consciousness. Trooper Easley testified that following the accident, ten ambulances and five helicopters responded to the scene to assist with the victims. The accident victims were sent to ten or eleven different hospitals.

Jana Schwartzberg, a Louisiana State University student, testified that on the morning of August 28, 2016, she was traveling westbound on I-10 in the left lane when she noticed a fire truck stopped ahead in the right lane. She looked in her rearview mirror and saw a black bus moving very fast behind her vehicle. The bus passed by her in the right lane and she assumed it would try to cut in front of the slow-moving traffic ahead of her in the left lane. She testified that she saw the bus try to suddenly cut over, after which debris "flew everywhere." The bus then swerved to the right and Ms. Schwartzberg saw more debris fly into the air. She did not see the black bus slow down or the driver apply his brakes at any time. She explained that after witnessing the crash, she stopped her car and ran to the accident scene where she saw several people in the water.

On that same morning, two additional witnesses reported that they saw the black bus driving erratically about eight to ten miles before the accident scene. Corey Landry and his co-worker, Gerard Breaux, testified that they were both driving eighteen-wheeler trucks hauling heavy machinery. Mr. Breaux was traveling west in the right lane on I-10 behind Mr. Landry when he looked into his mirror and saw a black bus moving over the center line. He noticed that the bus

19-KA-91                                                    4

was moving close to his load and moved over to allow more room for the bus to pass. He alerted Mr. Landry over the CB radio to keep an eye on the black bus as it passed.

After Mr. Breaux alerted him to the situation, Mr. Landry looked in his mirror and saw the bus almost hit his load. He also moved closer to the guardrail to allow the bus more room to pass. Mr. Landry explained that after the bus passed his truck, he saw it swerving in and out of lanes and dodging traffic before it disappeared from his sight. Then approximately a half mile from the accident scene, Mr. Landry saw a fire truck, lights and flares in the right lane. He testified that he and Mr. Breaux had ample time to slow down as they approached the accident scene.

When they arrived near the crash scene, Mr. Landry and Mr. Breaux both stopped and exited their trucks. They helped to remove ladders from the fire truck and place them over the side of the bridge to rescue the men knocked into the water by the bus. Both Mr. Landry and Mr. Breaux testified that they were not surprised when he saw that the black bus caused the crash.

Louisiana State Trooper Matthew Montgomery served as the lead investigator at the crash scene. He testified that when he arrived, he witnessed "complete chaos" with cars and debris everywhere, and victims in the water below the bridge. He stated that three people died and 39 or 40 people were injured in the accident.

During his investigation, Trooper Montgomery determined that nothing would have obstructed defendant's view of the fire truck and flares blocking the lane of the initial accident in front of him. Trooper Montgomery further explained that a person needed to obtain a commercial driver's license ("CDL") to operate a bus. Trooper Montgomery noted that a person who was operating a commercial

vehicle needed knowledge of air brake systems as they drove differently than passenger cars.

He further testified that he advised defendant of his rights and spoke to him with an interpreter present. Trooper Montgomery determined that defendant did not have either an individual driver's license or a CDL license. Defendant also told Trooper Montgomery that at approximately a mile away, he saw a vehicle slowing down and "something" up ahead. Finally, Trooper Montgomery testified that defendant's blood test was negative for marijuana, alcohol, or any type of opiates, and defendant was not talking or texting on his phone prior to the accident.

Louisiana State Trooper George Castaneda testified that he was called to the scene because a bus was involved in a fatal accident. Trooper Castaneda explained that in his position, he performs mandatory federal inspections of commercial vehicles on a daily basis and had inspected approximately 12,000 vehicles in the past 13 years. Trooper Castaneda spoke to defendant in Spanish and learned that while defendant had driven other types of commercial vehicles over the last eight years, he had no prior experience driving this type of bus. Defendant further explained that he had only been working for the owner of the bus for two days.

Trooper Castaneda further testified that he conducted a basic inspection of the bus and did not find any mechanical violations. He stated that due to the damage, he could not check all of the lights and was unable to determine if the brakes were working at the time of the crash. He attempted to step on the brake, but it did not work due to the damage from the impact. He stated that he did not discover any problem that led to the accident other than "the driver."

Trooper Lieutenant Eric Burson of the Louisiana State Police was accepted as an expert in the fields of accident reconstruction, heavy duty reconstruction, and motor vehicle inspections. He stated that in December of 2017, he performed an inspection of the bus and an accident reconstruction. He further testified that he

reviewed the video of the accident from a trooper's dashboard camera and that the video showed conclusively that the brakes on the bus were working. Trooper Burson asserted that even though the two rear brakes of the bus were different size chambers, which was a federal violation, that would not have affected the bus's ability to stop. He explained at the time of the crash the front wheels of the bus were turning to the left, but the bus continued straight toward the guardrail and the firefighters. He testified that these factors, along with the marks on the roadway, indicated to him that the brakes were locked up, working, and applied at some point prior to the crash.

Trooper Burson further testified that since the video showed the front brakes were working at the time of the accident, it was his opinion that they were working when defendant saw the initial accident. He also explained that in order to move the bus after the accident, the tow truck driver had to put caging bolts on the bus to move it. Trooper Burson explained that this factor indicated the brakes were working prior to the accident and then became locked up during the crash. He also testified that if defendant had pulled the emergency brake at the last minute, the three front skid marks on the road would not have been present.

Trooper Burson opined that the brakes were unequivocally working on the bus; that all four brakes, front and rear, locked when defendant applied the brakes; and that the only reason the bus did not stop sooner was "driver error." Trooper Burson testified that defendant did not apply the brakes until it was too late to avoid the crash. He asserted that if defendant had let off the gas pedal a mile out when he saw the initial accident and lights, he would not have crashed the bus. Trooper Burson noted that even if the bus had only two brakes and defendant saw the accident a mile out and "tapped" on the brakes, the bus would have stopped.

Dr. Samantha Huber, forensic pathologist, performed the autopsies of the victims. She testified that Vontarous Kelly survived for several days after the

accident, but died from complications from blunt force head injuries resulting from the motor vehicle collision caused by the bus. Jermain Starr's cause of death was also the result of blunt force injuries caused by the bus collision, which included extensive trauma to his face, a perforation of his left eye, contusions of his brain, herniation of the brain, a right clavicle fracture, a torn carotid artery, a fracture of one of the thoracic vertebrae in his spine, lacerations of his lungs due to rib fractures, and a fracture of his left femur. Dr. Huber finally testified that Mr. Chauvin's cause of death was blunt force injuries, which included extensive facial trauma, injuries on his chest, abdomen, and back associated with rib fractures, front rib fractures consistent with CPR, back rib fractures associated with lung contusions, extensive liver lacerations that were the main cause of blood loss, and a fracture of the upper part of the left tibia and left fibula.

After the State rested its case, the defense called Vickie Fuentes as a witness. Ms. Fuentes testified that on August 28, 2016, she was a passenger on the bus involved in the accident. She stated that at some point defendant started speeding and that the bus started moving from side to side the faster defendant went. She said that she felt like the bus was unbalanced, swaying from side-to-side, and swerving back and forth.

She testified that when she first saw the initial accident, it was not close. Ms. Fuentes further testified that she knew the driver saw the accident because she saw him either "fooling around" with the emergency brake or that he was holding something. She stated that when defendant saw that he could not brake he told them to, "[h]old on. Accidente," which she said meant "crash." Ms. Fuentes stated the accident was on the right-hand side and that when defendant could not brake, he tried to get on the other side. Ms. Fuentes testified that after the accident, the doorway of the bus was stuck since the bus hit the guardrail on that side, so everyone got nervous and tried to break the windows to get out. She asserted that

defendant helped the passengers on the bus get out. Afterward, Ms. Fuentes spoke to law enforcement and gave a statement.

After the jury found defendant guilty of three counts of negligent homicide, the trial court scheduled a sentencing hearing on April 9, 2018. Following a statement from Mr. Chauvin's wife, the prosecutor pointed out that three individuals passed away that day because of defendant's actions. He asked the trial court to give defendant the strictest sentence allowable under the law after considering defendant's gross negligence, his complete failure to consider other lives, and the resulting accident which left many families without fathers, husbands, sons and brothers.

Defendant subsequently addressed the trial court explaining his sorrow for causing the accident, but also stating that he did not consider himself "truthfully guilty." The trial court then sentenced defendant to three consecutive five-year sentences and provided the following reasons for imposing consecutive sentences:

> The next decision is whether to run this matter consecutively or concurrent. I've made this decision today that you will have these five year sentences to run consecutively. The law must tells me [sic] I must consider a number of factors when I make that very profound decision.
>
> Firstly, I don't find that you have any criminal past that I can discern or consider here today. While the mechanics of the event were violent, they were not violent events based on legal charges.
>
> The last element is the one that causes me the most pause and upon which I rest my decision today. It is the risk the Court thinks that the defendant may pose to the safety of the community. That's my basis for my running these sentences consecutive. In other words, one after the other.
>
> During the hearing of the trial, I was profoundly concerned with your lack of judgment, your lack of the ability to keep people in your charge safe and then your actions when coming upon other people, strangers. Because of my profound thoughts that you create a gross risk to this community, to the driving public, I find that a reason for imposing these sentences in a consecutive fashion. For these reasons orally assigned, I make that finding and we will commit those reasons and maybe others to writing within the next five days.[1]

---

[1] The record does not reflect that the trial court's reasons were reduced to writing.

On April 23, 2018, defendant filed a Motion to Reconsider Sentence Relative to Consecutive Sentencing of the Defendant. In that motion, defendant argued that the consecutive sentences were unconstitutionally excessive and that the trial court failed to properly consider mitigating factors for sentencing leniency, including that he has no prior convictions or arrests for crimes of violence, he did not own the bus he was driving, he stayed and helped the bus passengers after the accident when others told him to leave, and that was his first day driving the bus that was involved in the accident. He also pointed out that he has been driving commercial vehicles since he was eighteen years old.[2] Defendant argued that his crime of criminal negligence while driving a vehicle does not show any viciousness or potential to be dangerous. He stated that he is an illegal alien and that once his sentence is completed, he will be sent back to Honduras, his native land, so he would no longer be a danger to the citizens of this community. Defendant further contended that the trial court did not provide sufficient reasons on the record to justify consecutive sentences. On April 26, 2018, the trial court denied defendant's motion to reconsider sentence. As previously stated, defendant filed a timely motion to appeal.

**DISCUSSION**

In his assignments of error, defendant argues the trial court erred by denying his motion to reconsider sentence and contends that the maximum consecutive sentences imposed by the trial court are unconstitutionally excessive.

He contends that he was engaged in only one act that was determined to be criminal negligence, that he has no record of prior criminal activity, and that he showed extreme remorse at sentencing. Defendant also contends the trial court's perception that he posed a risk to the public safety was unfounded as there was no

---

[2] The record indicates that defendant's date of birth is August 12, 1979.

evidence that he had any prior traffic infractions or that the events leading up to this accident were anything but an isolated event with tragic consequences. Additionally, defendant asserts that the trial court failed to consider the mitigating evidence provided by one of the bus passengers, Ms. Fuentes, who he says testified that once the initial accident came into sight, defendant made motions as if he were trying to operate the brakes on the bus before shouting "hold on" and "crash" in Spanish. He also asserts that the trial court failed to consider that instead of fleeing the scene, he stayed and assisted the passengers on the bus.

The State responds that the trial court did not abuse its discretion in sentencing and that the maximum consecutive sentences were not constitutionally excessive. It further responds that the trial court considered the severity of the crime by acknowledging the profound impact the crime had on the lives of the three deceased victims, their families, and the community as a whole. The State asserts that the trial court presented reasonable justification and consideration in imposing maximum consecutive sentences for all three counts of negligent homicide.

Defendant was convicted of three counts of negligent homicide in violation of La. R.S. 14:32, which provides a sentencing range of imprisonment with or without hard labor for not more than five years, a fine of not more than $5,000, or both. The trial court sentenced him to five years at hard labor on each count to run consecutively and a $5,000 fine. As explained above, defendant argues the three maximum consecutive sentences are unconstitutionally excessive. Defendant did not orally object to the sentences below. However, because defendant challenged his sentences and the consecutive nature of them in a timely written motion to reconsider sentence filed in the trial court, those issues are properly before this Court on review. *See* La. C.Cr.P. art. 881.1(E).

The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it may be reviewed for constitutional excessiveness. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. *Id*. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Lawson*, 04-334 (La. App. 5 Cir. 9/28/04), 885 So.2d 618, 622.

A trial judge has broad discretion when imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. *State v. Dorsey*, 07-67 (La. App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. *Id*. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. *State v. Pearson*, 07-332, 07-333, 07-539 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 656. In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. *Id*.

When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the "terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively." La. C.Cr.P. art. 883. Although Article 883 favors the imposition of concurrent sentences for crimes committed as part of the same transaction or series of transactions, a trial court retains the discretion to impose consecutive penalties on the basis of other factors, including the offender's past criminality,

violence in the charged crimes, and the risks he poses to the safety of the community. *State v. Wilson*, 14-551 (La. App. 5 Cir. 1/28/15), 167 So.3d 903, 912. If the trial court imposes consecutive sentences for crimes arising from a single course of conduct, it must articulate the reasons it feels the sentence is necessary. *Id.* Although the imposition of consecutive sentences requires particular justification when the crime arises from a single course of conduct, consecutive sentences are not necessarily excessive. *Wilson*, 167 So.3d at 912.

In the instant matter, the evidence demonstrates the fire truck was stopped in the right lane and the right shoulder of the interstate and that flashing lights and flares were activated to warn drivers to slow down and to move to the left lane. The evidence also shows that defendant was driving recklessly prior to and at the time of the accident. Ms. Schwartzberg testified that the bus was going very fast in the right lane, that it did not slow down or brake, and that the bus driver tried to cut over in front of everyone else into the left lane, after which debris "flew everywhere." Mr. Landry testified that prior to the accident, the bus was swerving in and out of lanes and almost hit him. Mr. Breaux testified that the bus kept crossing the center line and came close to his load. Neither Mr. Landry nor Mr. Breaux had a problem slowing down their trucks and moving to the left lane when they saw the lights.

Though defendant does not have a prior criminal history, his dangerous and reckless actions caused the violent deaths of three individuals and injured almost 39 other people. He jeopardized the safety of dozens of people in the bus and on the roadway. Defendant did not have a regular driver's license or a commercial driver's license, which was needed to operate the bus. Trooper Burson testified that the brakes on the bus were working at the time of the accident and that the reason that the bus did not stop sooner was "driver error." Trooper Montgomery testified that based on his investigation, there was nothing obstructing the bus

driver's view of the initial accident. He opined that there was no reason why the bus driver would not have seen the fire truck or the flares. Trooper Montgomery asserted that defendant admitted to him that he saw a vehicle slowing down and "something" up ahead approximately a mile away. At sentencing, although defendant said that he felt sorry for what happened, he stated that he did not consider himself "truthfully guilty."

Louisiana courts have affirmed maximum or near maximum sentences in connection with negligent homicide convictions involving automobile accidents. In *State v. Shell*, 16-873 (La. App. 3 Cir. 4/12/17), 216 So.3d 853, the defendant pled no contest to negligent homicide following an automobile accident that resulted in the death of the passenger, and the trial court sentenced him to four years at hard labor. In imposing sentence, the trial court noted the defendant's blood alcohol level was .05, he was traveling seventy-five miles per hour in a thirty-five mile per hour zone, he lost control of the vehicle, and there was no evidence of braking. *Id.* at 856. The trial court also considered mitigating factors, including the defendant's lack of a criminal history and that he expressed remorse. *Id.* at 856-57. The trial court found a significant sentence was required based on the loss sustained by the friends and family of the young eighteen-year-old victim and the "exacting, reckless" nature of the underlying offense. On appeal, the appellate court indicated that the sentence was not excessive given the "life-altering nature of the offense to all involved." *Id.* at 858-59.

In *State v. Hughes*, 03-420 (La. App. 3 Cir. 12/31/03), 865 So.2d 853, *writ denied*, 04-663 (La. 9/24/04), 882 So.2d 1165, the appellate court affirmed a five-year sentence for negligent homicide. The facts showed that after the defendant and her estranged husband got into an argument, she attempted to commit suicide by driving her car into the path of a pickup truck driven by the victim. The victim died as a result of the impact. Even though the defendant was a first-time felony

offender and a mother of four children, the appellate court held that the maximum five-year sentence was not excessive.

In *State v. Rogers*, 07-276 (La. App. 3 Cir. 10/3/07), 966 So.2d 1212, the court affirmed the trial court's sentence of three and one-half years of imprisonment where the defendant, who was driving at an excessive rate of speed with the victim and her young son as passengers, crashed. The victim remained in the car and was burnt beyond recognition while the defendant hitchhiked to the victim's parents' house and left the victim's son on the porch. After he returned home, the defendant failed to report the incident.

Jurisprudence examining consecutive sentences for similar negligent homicide convictions is limited. In *State v. Pelt*, 448 So.2d 1294 (La. 1984), *cert. denied*, 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984), the defendant was convicted of negligent homicide arising from a collision between the defendant's truck and a motorcycle which resulted in the death of two people. There was evidence that the defendant had been drinking. The defendant had a history of traffic and DWI offenses. The Louisiana Supreme Court found that the two five-year concurrent sentences were not excessive.

While a comparison of sentences imposed for similar crimes may provide insight, sentences must be individualized to the particular offender and to the particular offense committed. *State v. Ducksworth*, 17-35 (La. App. 5 Cir. 12/13/17), 234 So.3d 225, 237. Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, 958, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Based on the record and reasons provided by the trial court, we cannot find that the trial court abused its broad sentencing discretion by finding defendant to be

a gross risk to society and imposing consecutive sentences. At sentencing, defendant stated that he did not consider himself "truthfully guilty." At the time of the accident, defendant was driving without any type of license. Several witnesses testified regarding the reckless nature of defendant's driving even well prior to the accident, and this behavior resulted in the death of three individuals and the injury of numerous others.

## ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). We find no errors requiring corrective action.

## DECREE

For the foregoing reasons, we affirm defendant's convictions and consecutive sentences on three counts of negligent homicide.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**NOVEMBER 13, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL
PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 19-KA-91

**E-NOTIFIED**
40TH DISTRICT COURT (CLERK)
HONORABLE J. STERLING SNOWDY (DISTRICT JUDGE)
HONORABLE BRIDGET A. DINVAUT          LIEU T. VO CLARK (APPELLANT)          HENRI P. DUFRESNE (APPELLEE)
(APPELLEE)

**MAILED**
NO ATTORNEYS WERE MAILED